IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CHRISTOPHER NOHEA EDENFIELD, )          Civ. No. 05-00418 SOM/BMK
JAY-LEE A. KEOLANUI, as Next  )
Friend of KYLE K. KEOLANUI-   )
EDENFIELD, a Minor,           )          ORDER GRANTING IN PART AND
                              )          DENYING IN PART DEFENDANTS'
          Plaintiffs,         )          MOTIONS FOR SUMMARY JUDGMENT
                              )
     vs.                      )
                              )
THE ESTATE OF ARNOLD WILLETS; )
CITY AND COUNTY OF HONOLULU;  )
STANLEY McCABE, ROBERT TOWNE, )
RALSTAN TANAKA, OFEINA UNGA,  )
CHRISTOPHER JOHNSON, STUART   )
YANO, BARRY TONG, DOE         )
DEFENDANTS 8-100 AND DOE      )
ENTITITES 1-100,              )
                              )
          Defendants.         )
_____ )

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

          Defendants Stanley McCabe ("Officer McCabe"), Robert

Towne ("Officer Towne"), Ralstan Tanaka ("Officer Tanaka"),

Ofeina Unga ("Officer Unga"), Christopher Johnson ("Officer

Johnson"), and Stuart Yano ("Officer Yano") (collectively, "the

Officers"), and Defendant City and County of Honolulu ("the

City") (collectively, "Defendants") move for summary judgment as

to all claims asserted against them in the Third Amended

Complaint ("complaint") by Plaintiffs Christopher Nohea Edenfield

("Chris") and Jay-Lee A. Keolanui, as Next Friend of Kyle K. Keolanui-Edenfield ("Kyle") (collectively, "Plaintiffs").[1]

In the complaint, Plaintiffs assert that Defendants "violated the constitutional rights of Plaintiffs, including but not limited to the rights to liberty, freedom from unreasonable seizures, and other civil liberties protected by the United States Constitution in violation of 42 U.S.C. § 1983." Plaintiffs also assert various state law claims against Defendants: (1) assault; (2) battery; (3) intentional infliction of emotional distress; and (4) negligent infliction of emotional distress. Plaintiffs additionally assert a negligent supervision claim against the City.

There are two motions before the court, one by the Officers, the other by the City. In their motion for summary judgment, the Officers contend that they are entitled to qualified immunity as to the § 1983 claim against them. They argue that Plaintiffs were not seized for purposes of the Fourth Amendment and that their conduct did not violate Plaintiffs' substantive due process rights guaranteed by the Fourteenth Amendment. Thus, the Officers argue that Plaintiffs' constitutional rights were not violated. Regarding the state law claims against them, the Officers argue that they are protected

---

[1] Officer Barry Tong ("Officer Tong") is also a Defendant in this case, but has not moved for summary judgment.

by the qualified or conditional privilege recognized by Hawaii law.  The court concludes that genuine issues of material fact preclude summary judgment as to the § 1983 claim.  However, the court grants summary judgment in favor of the Officers on the state law claims because the record lacks evidence of malice.

The City contends in its motion that it is entitled to summary judgment as to Plaintiffs' § 1983 claim because the Officers did not violate Plaintiffs' constitutional rights, and because Plaintiffs fail to assert a viable claim based on ratification or inadequate training.  The City also contends that it is entitled to summary judgment on Plaintiffs' state law claims because it cannot be vicariously liable if the Officers are not.  The court concludes that genuine issues of material fact preclude summary judgment on the § 1983 claim.  To the extent that the Officers have a privilege against liability for the state law claims, the City is entitled to summary judgment on those claims as well.  This leaves Plaintiffs with their claims against the City relating to liability under state law for Officer Tong's actions and for negligent supervision of Officer Tong and the other Officers.

II.      <u>LEGAL STANDARD.</u>

Summary judgment shall be granted when

the pleadings, depositions, answers to
interrogatories, and admissions on file,
together with the affidavits, if any, show
that there is no genuine issue as to any

3

> material fact and that the moving party is
> entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr.,
383 F.3d 1018, 1024 (9th Cir. 2004); Addisu v. Fred Meyer, Inc.,
198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal
purposes of summary judgment is to identify and dispose of
factually unsupported claims and defenses.  Celotex Corp. v.
Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that
fails to demonstrate facts to establish what will be an essential
element at trial.  See id. at 323.  A moving party without the
ultimate burden of persuasion at trial--usually, but not always,
the defendant--has both the initial burden of production and the
ultimate burden of persuasion on a motion for summary judgment.
Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102
(9th Cir. 2000).  The burden initially falls upon the moving
party to identify for the court "those portions of the materials
on file that it believes demonstrate the absence of any genuine
issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec.
Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing
Celotex Corp., 477 U.S. at 323).

"When the moving party has carried its burden under
Rule 56(c), its opponent must do more than simply show that there
is some metaphysical doubt as to the material facts."  Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial."  Porter, 383 F.3d at 1024 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134 (citation omitted).  "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial."  Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words,

evidence and inferences must be construed in the light most favorable to the nonmoving party.  <u>Porter</u>, 338 F.3d at 1024.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  <u>Id.</u> However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  <u>T.W. Elec. Serv.,</u> 809 F.2d at 631.

The summary judgment burdens are properly applied to a motion asserting qualified immunity.  <u>See</u> <u>Butler v. San Diego Dist. Attorney's Office</u>, 370 F.3d 956, 958 (9th Cir. 2004) ("When a defendant makes a properly supported motion for summary judgment based on official immunity, the plaintiff has an obligation to produce evidence of his or her own.  In such a case, the district court is not required (or even allowed) simply to assume the truth of challenged factual allegations in the complaint.  In other words, a motion for summary judgment based on official immunity is governed by Federal Rule of Civil Procedure 56, just like all motions for summary judgment in civil suits in federal district court.").

III.     <u>BACKGROUND FACTS.</u>

On October 4, 2002, Officers McCabe and Yano, who were operating undercover, approached a parked truck at Laenani Beach Park, allegedly thinking it was "suspicious."  Ex. 1 at 3079.

Arnold Willets ("Willets")[2] was sitting in the driver's seat. Ex. 1 at 3079.  Officer McCabe knocked on the driver's side window while Officer Yano went to the passenger door.  Ex. 1 at 3080.  Although Willets's passenger got out of the truck, Willets started the truck and hit the Officers' van, "crashing between two galvanized poles in the playground."  Ex. 1 at 3080-81. Willets then drove across a volleyball court and a baseball field and fled the area.  Ex. 1 at 3081.  Officer McCabe told Officers Tong, Troy Kamekona ("Officer Kamekona"),[3] and Yano "to make dispatch and the uniform officers aware of the incident."  Ex. 1 at 3081.

After hearing about the fleeing truck over the police radio, Officer Unga, who was in plain clothes, began searching for the truck.  Ex. 1 at 2914.  He saw the truck parked in a residential neighborhood, and Officer McCabe told him to keep the vehicle in sight.  Ex. 1 at 2915.  He then saw two men walk from a home toward the truck.  Ex. 1 at 2915.  Officer Unga saw one of the men, later identified as Willets, carrying a small child who was wearing only a diaper.  Ex. 1 at 2915.  Although Officer Unga could not see whether Willets got into the truck, he saw the other man, later identified as Chris Edenfield, and the small

---

[2] The caption used in the City's papers refers to "Arnold Willetts."  However, the autopsy report as well as other evidence in the record indicate that his last name was "Willets."

[3] Officer Kamekona is not a party in this case.

child, later identified as Kyle Edenfield, get into the truck.
Ex. 1 at 2916.  Officer Unga noted that neither man seemed
distressed, and that neither appeared to have any weapon at that
time.  Ex. 1 at 2916.  After the truck left the residential
neighborhood, Officer Unga told Officer McCabe over the police
radio what he had seen, and Officer McCabe told him to ask
uniformed officers for help in stopping the truck.  Ex. 1 at
2916, 3082.  Officer McCabe did not tell anyone or direct any
officer to tell anyone that there was a small child in the truck.
Ex. 2 at 65.

Officer Tong heard Officer Unga's statement over the
police radio that he had seen two men and a child walk toward the
truck.  Ex. 3 at 58.  Officer Tong understood that the Officers
"needed the vehicle" because it was "evidence for the commission
of that crime" that had occurred earlier at the beach park.
Ex. 3 at 65.  He also believed that "the people inside the
vehicle could possibly tell us where [Willets was]."  Ex. 3
at 66.

According to Chris, Willets drove away from the
residence and stopped at a red light, where a police officer came
up and knocked on the driver's side window.  Declaration of Chris
Edenfield ("Chris Decl.") 3/14/2006 ¶ 11.  Willets ignored the
officer and drove away, hitting two vehicles.  Id. ¶ 12.  Chris

says that Willets then fired his shotgun out of the driver's side window, "pointing it up into the air."  Id.

Officer Johnson also heard the broadcast to stop the truck.  Ex. 1 at 3034.  After spotting the truck as it was moving, he turned on his blue light and sounded his siren.  Ex. 1 at 3034.  Officer Tanaka then drove his car to where the truck was, and his car joined the police cars following the truck. Declaration of Ralstan Tanaka ("Tanaka Decl.") 1/31/2006 ¶¶ 7-9. Willets did not respond to the blue light or siren and kept driving, running a red light.  Ex. 1 at 3034-35.  Eventually, Officer Towne pulled up next to the truck.  Willets shot at Officer Towne's car and shattered his passenger side window. Ex. 1 at 2903-04, 3035; Declaration of Robert Towne ("Towne Decl.") 1/31/2006 ¶ 10; Chris Decl. ¶ 14.

Officer Johnson continued to follow the truck.  Ex. 1 at 3035.  He saw the truck pull over, so he stopped and got out of his car, thinking that Willets would also get out of the truck.  Ex. 1 at 3035.  Officers Towne, Unga, and Yano also saw Willets stop and got out of their vehicles.  Towne Decl. ¶ 13; Declaration of Ofeina Unga ("Unga Decl.") 1/31/2006 ¶¶ 16-17. However, instead of getting out of his truck, Willets made a quick U-turn and drove back toward the Officers.  Ex. 1 at 3036; Towne Decl. ¶ 14.  Officers Towne and Yano saw Willets point his shotgun at them and heard a loud explosion.  Towne Decl. ¶ 17;

9

Declaration of Stuart Yano ("Yano Decl.") 1/31/2006 ¶ 18.
Officer Unga saw Willets's shotgun protruding from the driver's
side window.  Unga Decl. ¶ 18.  Officers Johnson and Tanaka saw
Willets shoot at other officers.  Ex. 1 at 3036; Declaration of
Christopher Johnson ("Johnson Decl.") 1/30/2006 ¶ 18; Tanaka
Decl. ¶ 16.  Allegedly fearing for their lives, Officers Towne,
Johnson, Unga, Tanaka, and Yano returned fire at Willets.  Ex. 1
at 3036; Towne Decl. ¶ 18; Unga Decl. ¶ 19; Yano Decl. ¶ 19;
Tanaka Decl. ¶ 18.  During this exchange of fire, Chris was shot
in the neck by one of the Officers.  Chris Decl. ¶ 17.

Willets lost control of the truck and crashed it at
Kaneohe District Park on top of a concrete barrier.  The
passenger side of the truck was pinned against a fence.  Ex. 1 at
2100, 2107, 2448, 2960.  The parties dispute whether Willets
fired his shotgun after the truck crashed.  Compare Chris Decl.
¶ 19 ("Willets did not fire at police after the truck crashed.")
with Johnson Decl. ¶ 18 ("I observed Willets firing at other
officers."); Yano Decl. ¶¶ 23, 24 ("I observed Willets firing at
Sgt. Towne and Officer Unga."); Tanaka Decl. ¶ 20 ("I observed
Willets firing at other officers while still stuck on the wall
and in the truck."); Unga Decl. ¶ 22.  Officers Tong, Johnson,
Towne, Unga, and Yano fired at Willets after the truck crashed.[4]

---

[4] Officer Tanaka says he did not fire at Willets after
the truck crashed.  Tanaka Decl. ¶ 21.

10

Ex. 3 at 105-07 (Officer Tong); Johnson Decl. ¶ 19; Unga Decl. ¶ 23; Towne Decl. ¶ 22; Yano Decl. ¶ 24. All but two of the Officers clearly knew that a man and a child were passengers in the truck. Officers Johnson and Towne say they did not know of the child's presence at the time. Ex. 1 at 2901, 2909 (Officer Towne), 2940 (Officer Yano), 2955 (Officers Unga and Tanaka); Ex. 2 at 65 (Officer McCabe); Ex. 4 at 45 (Officer Johnson). But see Ex. 1 at 3003 (Officer Towne says in his report that Officer Johnson relayed to him that "he thought he saw a possible juvenile in the vehicle").

While some of the Officers were firing at the truck, Chris leaned out of the passenger side window, waving his arms and screaming for help. Chris Decl. ¶ 22. Chris was shot in the thigh and the hand, id. ¶¶ 22-23, and the truck then caught on fire, id. ¶ 24. Because Chris could not get out through the passenger door, he dropped Kyle out of the driver's side window and climbed over Willets to get out through that window. Id. ¶¶ 26, 28, 29. Willets fell out of the window after Chris, and the two began to wrestle on the ground. Id. ¶ 29.

After the gunfire ended, the police declared a possible hostage situation. Ex. 1 at 2961. Chris was handcuffed and taken to an ambulance. Chris Decl. ¶¶ 31-32. Officer McCabe, who arrived at Kaneohe District Park after the shooting had stopped, told the other Officers that Chris was not Willets. Id.

11

¶ 31; Declaration of Stanley McCabe ("McCabe Decl.") 1/31/2006
¶ 5.  Officer Johnson picked up Kyle and rushed him to a Honolulu
Fire Department vehicle.  Johnson Decl. ¶ 20.  Chris and Kyle
were then taken to Queen's Medical Center.  Chris Decl. ¶ 33.

On May 13, 2003, the Internal Affairs Administrative
Review Board ("review board") convened to review the
circumstances surrounding the Officers' firing of their guns.
Ex. 1 at 1471.  The review board "found that the officers'
discharge of their firearms was justified and recommended that no
further action be taken against them."  Ex. 1 at 1471.  Chief of
Police Lee D. Donohue ("Chief Donohue") concurred with the review
board.  Ex. 1 at 1470.

IV.    <u>ANALYSIS.</u>

A.    <u>The Officers' Motion.</u>

1.    <u>Plaintiffs' § 1983 Claim.</u>

The Officers argue that they have qualified immunity
with respect to Plaintiffs' § 1983 claim.  Motion at 4-11.  The
Officers argue that they did not violate Plaintiffs' Fourth
Amendment rights, as their conduct did not result in a "seizure"
of Plaintiffs.  Motion at 5-7.  Nor, they argue, did they violate
Plaintiffs' substantive due process rights guaranteed by the
Fourteenth Amendment, as their actions did not shock the
conscience.  Motion at 7-11.  Because there are genuine issues of

material fact as to whether the Officers seized Plaintiffs, the
court denies summary judgment on this claim against the Officers.

Section 1983 provides, in relevant part:

> [E]very person who, under color of any
> statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the
> District of Columbia, subjects or causes to
> be subjected, any citizen of the United
> States . . . to the deprivation of any
> rights, privileges, or immunities secured by
> the Constitution and laws, shall be liable to
> the party in an action at law, suit in equity
> or other proper proceeding to redress.

42 U.S.C. § 1983.

"Qualified immunity . . . shields § 1983 defendants
'from liability for civil damages insofar as their conduct does
not violate clearly established statutory or constitutional
rights of which a reasonable person would have known.'"
Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see
also San Jose Charter of the Hells Angels Motorcycle Club v. City
of San Jose, 402 F.3d 962, 971 (9th Cir. 2005).  The qualified
immunity doctrine protects government officials from their
exercise of poor judgment, and fails to protect only those who
are "plainly incompetent or those who knowingly violate the law."
Malley v. Briggs, 475 U.S. 335, 341 (1986).  The purpose of
qualified immunity is to protect officials from undue
interference with their duties and from potentially disabling
threats of liability.  Sinaloa Lake Owners Ass'n v. City of Simi

13

<u>Valley</u>, 70 F.3d 1095, 1098 (9th Cir. 1994).  The Supreme Court has therefore stated that qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001).  The Supreme Court has cautioned that a ruling on a qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  <u>Id.</u>

<u>Saucier</u> defined the qualified immunity analysis as a two-step process.  First, a court examines whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right.  If no constitutional right would have been violated by the alleged actions, a defendant has qualified immunity.  On the other hand, if a violation could be made out when the facts are interpreted in the light most favorable to the injured party, the next step is to ask whether the right was clearly established.  If the law did not put the defendant on notice that his or her conduct would clearly be unlawful, the official has qualified immunity from the claim.  <u>Saucier</u>, 533 U.S. at 201; <u>see also</u> <u>San Jose Charter of the Hells Angels Motorcycle Club</u>, 402 F.3d at 971; <u>Beier v. City of Lewiston</u>, 354 F.3d 1058, 1065 (9th Cir. 2004).

14

In light of <u>Saucier</u>, this court's first inquiry is whether the Officers' conduct violated Plaintiffs' Fourth Amendment rights.[5]

According to the Officers, "Plaintiffs do not state a claim for violation of the Fourth Amendment's prohibition against unreasonable seizure" because "it is not a seizure to inadvertently hit the hostage when they are trying to 'seize' the hostage taker."  Motion at 5-6 (citing <u>Medeiros v. O'Connell</u>, 150 F.3d 164 (2d Cir. 1998); <u>Rucker v. Harford County</u>, 946 F.2d 278 (4th Cir. 1991); <u>Landol-Rivera v. Cosme</u>, 906 F.2d 791 (1st Cir. 1990)).  Plaintiffs respond that, while the Officers were trying to stop the truck, they did not know that Plaintiffs were hostages and so were not analogous to officers who inadvertently injure hostages.  Opp. at 24.  Rather, Plaintiffs refer this court to cases in which officers injured innocent bystanders, not

---

[5] Plaintiffs also argue that the Officers violated their Fourteenth Amendment rights.  In their opposition to the Officers' motion, Plaintiffs make clear that they rely on the Fourteenth Amendment only if the court concludes that they were not seized under the Fourth Amendment.  Opp. at 25 ("Should this Court fail to find a Fourth Amendment cause of action in the case at bar, Plaintiffs assert Defendants violated their Fourteenth Amendment rights.").  The Supreme Court has held that, in cases involving injuries by law enforcement officials, a substantive due process analysis under the Fourteenth Amendment is appropriate only if the Fourth Amendment is inapplicable.  <u>See City of Sacramento v. Lewis</u>, 523 U.S. 833, 844-45 (1998).  Because the court concludes that there are genuine issues of material fact as to whether Plaintiffs state a Fourth Amendment violation, the court need not address Plaintiffs' alternative Fourteenth Amendment argument.

15

hostages.  Opp. at 20-22 (citing <u>Fisher v. City of Memphis</u>,
234 F.3d 312 (6th Cir. 2001); <u>Keller v. Frink</u>, 745 F. Supp. 1428
(S.D. Ind. 1990)).

> The Fourth Amendment to the United States Constitution
protects against unreasonable seizures:

> > The right of the people to be secure in their
> > persons, houses, papers, and effects, against
> > unreasonable searches and seizures, shall not
> > be violated, and no Warrants shall issue, but
> > upon probable cause, supported by Oath or
> > affirmation, and particularly describing the
> > place to be searched, and the persons or
> > things to be seized.

Thus, to determine whether Plaintiffs' Fourth Amendment right
against unreasonable seizures was violated, this court must first
determine whether Plaintiffs were seized.  <u>See</u> <u>Brower v. County
of Inyo</u>, 489 U.S. 593, 595-97 (1989).

> <u>Brower</u> discussed seizures in depth.  In that case, a
fleeing suspect was killed when his car crashed into a police
roadblock.  489 U.S. at 594.  His heirs, the plaintiffs, claimed
the police had used unreasonable physical force in establishing
the roadblock and thus effected an unreasonable seizure of the
suspect, in violation of the Fourth Amendment.  <u>Id.</u>  In
determining whether the suspect had been "seized," the Supreme
Court stated:

> > Violation of the Fourth Amendment
> > requires an intentional acquisition of
> > physical control.  A seizure occurs even when
> > an unintended person or thing is the object
> > of the detention or taking, but the detention

16

> or taking itself must be willful.  This is
> implicit in the word "seizure," which can
> hardly be applied to an unknowing act.  The
> writs of assistance that were the principal
> grievance against which the Fourth Amendment
> was directed did not involve unintended
> consequences of government action. . . .  In
> sum, the Fourth Amendment addresses "misuse
> of power," not the accidental effects of
> otherwise lawful government conduct.
>
> Thus, if a parked and unoccupied police
> car slips its brake and pins a passerby
> against a wall, it is likely that a tort has
> occurred, but not a violation of the Fourth
> Amendment.  And the situation would not
> change if the passerby happened, by lucky
> chance, to be a serial murderer for whom
> there was an outstanding arrest warrant--even
> if, at the time he was thus pinned, he was in
> the process of running away from two pursuing
> constables.  It is clear, in other words,
> that a Fourth Amendment seizure does not
> occur whenever there is a governmentally
> caused termination of an individual's freedom
> of movement (the innocent passerby), nor even
> whenever there is a governmentally caused and
> governmentally <u>desired</u> termination of an
> individual's freedom of movement (the fleeing
> felon), but only when there is a governmental
> termination of freedom of movement <u>through
> means intentionally applied</u>.

<u>Id.</u> at 596-97 (internal citations omitted).

In <u>Reed v. Hoy</u>, 909 F.2d 324, 329 (9th Cir. 1990), the

Ninth Circuit relied on <u>Brower</u> in holding that a police officer,

in intentionally shooting a man approaching him with a weapon,

"seized" the suspect for purposes of the Fourth Amendment.  The

court stated:  "The <u>Brower</u> analysis breaks down into a three-part

test:  a seizure is a (1) governmental (2) termination of freedom

of movement (3) through means intentionally applied."  <u>Id.</u>

17

Because (1) the police officer was a government actor, (2) the suspect's freedom of movement was terminated when he was shot, and (3) "[the officer] intended to shoot [the suspect] when he discharged the revolver[] and . . . the shooting was intended to stop [the suspect's] freedom to continue to advance toward [the officer]," the Ninth Circuit concluded that the suspect had been seized.  Id.

While Reed determined that a seizure occurred when a police officer intentionally used deadly force against a man approaching him with a weapon, the Ninth Circuit has not addressed whether inadvertent injuries that a police officer inflicts on a hostage or innocent bystander while attempting to stop another person constitute a seizure under the Fourth Amendment.  Other jurisdictions have addressed these issues, focusing on, as discussed below, to whom or at what the officers directed their physical restraint.

When known hostages are inadvertently injured by law enforcement officers pursuing the hostage-taker, courts have held that the hostages are not seized for Fourth Amendment purposes, because officers do not intend to restrain known hostages.  See, e.g., Childress v. City of Arapaho, 210 F.3d 1154, 1157 (10th Cir. 2000); Medeiros, 150 F.3d at 168; Landol-Rivera, 906 F.2d at 795.  For example, in Landol-Rivera, a robber grabbed the plaintiff as a hostage and held the plaintiff at gunpoint.

18

906 F.2d at 792.  After commandeering a passing car, the robber took over the driver's position, with the plaintiff on his lap. Id.  The pursuing officers fired at the car, and one bullet hit the plaintiff in the jaw.  Id.  In determining whether the plaintiff was seized, the First Circuit noted that "[t]he Supreme Court in Brower carefully distinguished between police action directed toward producing a particular result--in Fourth Amendment parlance, 'an intentional acquisition of physical control'--and police action that simply causes a particular result."  Id. at 795.  The court continued:  "Unless the restraint of liberty at issue resulted from an attempt to gain control of the individual, . . . there has been no Fourth Amendment seizure."  Id.

Focusing on the intent of the police officers, the First Circuit said:  "It is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim."  Id. at 796.  In other words, "A police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern."  Id. at 795.

In Medeiros, 150 F.3d at 169, the Second Circuit held that a hostage shot in crossfire by state troopers had not been seized.  The court followed the First Circuit's reasoning in

19

Landol-Rivera and noted, "So far from seeking to restrain [the hostage's] freedom, the troopers' every effort was bent on delivering all the hostages from deadly peril." Medeiros, 150 F.3d at 168.  The court concluded that "[t]he claim presented in this case vindicates no interest protected by the Fourth Amendment." Id.

Similarly, in Childress, 210 F.3d at 1155, two prisoners escaped from prison, forced their way into the plaintiffs' house, and abducted a mother and her two-year-old daughter.  After the prisoners stole the plaintiffs' minivan and held them hostage in the vehicle, police officers set up several roadblocks and fired shots at the van, knowing that hostages might be in the van. Id.  The mother was shot multiple times, and her child was injured in the chest, legs, and back. Id. at 1156.  In concluding that the plaintiffs had not been seized, the Tenth Circuit relied on the reasoning in Landol-Rivera and Medeiros. Id. at 1157.  The court noted that the police officers "did not 'seize' plaintiffs within the meaning of the Fourth Amendment but rather made every effort to deliver them from unlawful abduction." Id.  Citing Brower, the court concluded: "The injuries inflicted were the unfortunate but not unconstitutional 'accidental effects of otherwise lawful conduct.'" Id. (citing Brower, 489 U.S. at 596).

Courts addressing whether <u>innocent bystanders</u> are seized when inadvertently injured by law enforcement officers similarly focus on the "intended object" of the officers' physical restraint.  For example, in <u>Rucker</u>, 946 F.2d at 279, the Fourth Circuit considered a situation in which state troopers chased a suspect in a Bronco for failing to pay a highway toll.  The suspect drove through cornfields, disappearing from the officers' sight.  <u>Id.</u> at 280.  In the meantime, David Rucker ("Rucker") and his friends approached the area in their vehicle, but were asked to leave by one of the officers.  <u>Id.</u>  Instead of leaving, Rucker drove into another field, left his vehicle, and lay down on an embankment, apparently to watch what was happening.  <u>Id.</u>  When the officer who had previously asked Rucker to leave the area spotted the suspect's vehicle turning down a driveway, the officer shot at the vehicle's tires, not knowing that Rucker remained in the area.  <u>Id.</u>  One of the bullets hit Rucker.  <u>Id.</u>  In concluding that Rucker had not been seized, the Fourth Circuit focused on the "intended object" of the shooting:

> [O]ne is "seized" within the fourth amendment's meaning only when one is the <u>intended object</u> of a physical restraint by an agent of the state.  This means that a fourth amendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of the specific act of physical restraint.  But it does not mean, as Rucker contends, that a seizure occurs just so long as the act of restraint itself is intended (here the act of

> shooting) though it restrains one not
> intended to be restrained.

Id. (citations omitted).  Because it was undisputed that "Rucker
was not the intended object of the shooting by which he was
injured," the court held that he had not been seized for purposes
of the Fourth Amendment.

In Fisher, 234 F.3d at 315, a Sixth Circuit case, a
police officer stopped to speak to two women in the middle of the
street.  The officer and the women noticed a car approaching
them.  Id.  To avoid being hit, the women jumped onto the curb,
and the officer jumped onto the hood of his car, simultaneously
firing his gun at the car.  Id.  The bullet went through the
driver's side window and hit the passenger, Elitia Fisher
("Fisher").  Id.  In concluding that Fisher had been seized, the
Sixth Circuit noted that "police officers do seize any person who
is a deliberate object of their exertion of force."  Id. at 318
(citation omitted).  The court explained that "[the car] was the
intended target of [the officer's] intentionally applied exertion
of force.  By shooting at the driver of the moving car, he
intended to stop the car, effectively seizing everyone inside,
including [Fisher]."  Id. at 318-19.  The court distinguished
this case from "cases involving hostages, where an officer is
attempting to shoot one individual (the fleeing felon) and avoid
another (the hostage)."  Id. at 319 n.3 (citation omitted).
Unlike in hostage situations, "[t]he officer here was not

22

attempting to distinguish between [Fisher and the driver].  He was firing in an attempt to stop the vehicle." Id.

In Keller, 745 F. Supp. at 1429, decided by the district court for the Southern District of Indiana, a conservation officer received a report that a deer had been illegally shot.  The officer went to the deer carcass and waited near it to see if anyone would retrieve it.  Id.  A van pulled up to the deer, and two passengers loaded the deer into the van.  Id.  The officer yelled at the men, but the van drove off.  Id.  The officer then shot at the van, and a slug struck the driver in the back.  Id.  The parties disputed whether the officer intended to mark the van for later identification or whether he intended to stop the van when he fired at it.  Id.  The court denied the officer's motion for summary judgment and left for the trier of fact the question of whether shooting at the van demonstrated an intent to stop it.  Id. at 1432.  The court noted, "If answered in the affirmative, then Keller was seized within the meaning of the Fourth Amendment." Id.

Guided by the above cases, this court concludes that whether Plaintiffs were seized by the Officers turns on whether the Officers intended to direct their physical restraint at Plaintiffs and/or the truck.  If the Officers believed Plaintiffs were hostages, the Officers arguably did not seize Plaintiffs, as the Officers arguably did not intend to restrain them.  See

23

<u>Childress</u>, 210 F.3d at 1157; <u>Medeiros</u>, 150 F.3d at 168; <u>Landol-Rivera</u>, 906 F.2d at 795.  If the Officers believed Plaintiffs were innocent bystanders, the Officers arguably seized Plaintiffs, as the Officers arguably intended to stop the truck Plaintiffs were riding in.  <u>See</u> <u>Fisher</u>, 234 F.3d at 319; <u>Keller</u>, 745 F. Supp. at 1432.  However, if the Officers were unaware of Plaintiffs' presence, it may be that no seizure occurred, as the Officers could not have intended to direct their restraint against them.  <u>See</u> <u>Rucker</u>, 946 F.2d at 281.  Finally, if the Officers believed Plaintiffs were suspects, the Officers arguably seized Plaintiffs, provided the <u>Reed</u> factors are met.  <u>See</u> <u>Reed</u>, 909 F.2d at 329 ("a seizure is a (1) governmental (2) termination of freedom of movement (3) through means intentionally applied").  Thus, to determine whether Plaintiffs were seized, the court must decide how the Officers were directing their physical restraint.

The record indicates that Officers McCabe, Unga, Tanaka, and Yano knew Plaintiffs were in the truck.  <u>See</u> Ex. 1 at 2940 (Officer Yano), 2955 (Officers Unga and Tanaka); Ex. 2 at 65 (Officer McCabe).  Officers Johnson and Towne say that, although they were aware of Chris's presence, they did not know of Kyle's presence until after the truck had crashed.  Ex. 1 at 2901, 2909; Ex. 4 at 45.  <u>But see</u> Ex. 1 at 3003 (according to Officer Towne's report, Officer Johnson relayed to him that "he thought he saw a possible juvenile in the vehicle").

24

The Officers are conspicuously silent with respect to whether they thought Plaintiffs were hostages when they fired at and attempted to stop the truck.[6]  The court therefore declines on the present record to treat this case as one involving known hostages.

The court is left with a genuine dispute as to whether the Officers intended to direct their restraint at <u>Willets only</u>, at <u>Chris</u>, as a possible suspect, and/or at <u>the truck</u>, thereby seizing Plaintiffs who were inside the truck.  Plaintiffs point to evidence in the record showing that the Officers believed they should or were instructed to stop the truck because it had been involved in criminal activity at the beach park.  Ex. 1 at 3082; Ex. 2 at 52-53; Ex. 4 at 41.  If the Officers directed their physical restraint at the truck and not a particular individual, as this evidence suggests, Plaintiffs may have been seized.  <u>See</u> <u>Fisher</u>, 234 F.3d at 319; <u>Keller</u>, 745 F. Supp. at 1432.  Plaintiffs also point to evidence that Chris may have been considered a suspect during the pursuit and shootout, as the Officers were initially unsure if Chris was Willets, and Chris was handcuffed after the shooting stopped.  <u>See</u> Ex. 1 at 3082;

---

[6] Plaintiffs point to evidence showing that Officer McCabe did not consider whether Plaintiffs were hostages and that Officer Johnson did not consider that Chris might have been a hostage.  Ex. 2 at 52-53; Ex. 4 at 48.  They also point to evidence showing that Officer Tanaka "heard over the radio that there was a possible hostage situation" only after the shooting at Kaneohe District Park had already ceased.  Ex. 1 at 2961.

25

Chris Decl. ¶¶ 31-32.  This evidence supports Plaintiffs'
argument that the Officers directed their physical restraint at
Chris, thereby intending to seize him.

The Officers say they aimed at Willets, suggesting that
they were going beyond merely trying to stop the truck.  <u>See</u>,
<u>e.g.</u>, Towne Decl. ¶¶ 18 ("I drew my HPD issued service pistol and
fired at the driver, Willets."), 22; Johnson Decl. ¶¶ 16 ("I
returned fire, aiming for the driver, Willets."), 19; Unga Decl.
¶¶ 19 ("I shot twice at Willets."), 23; Yano Decl. ¶¶ 19 ("I
fired at Willets."), 24-25; Tanaka Decl. ¶ 18 ("I returned fire,
aiming for the driver, Willets.").  This is evidence that the
Officers were distinguishing between Willets and his passengers,
lending support to the Officers' argument that they did not seize
Plaintiffs.

On the current record, a genuine dispute of material
fact exists as to where the Officers were directing their
physical restraint.  The court is unable to determine whether a
seizure occurred and whether Plaintiffs' Fourth Amendment rights
were violated.  Accordingly, the court denies summary judgment as
to Plaintiffs' § 1983 claim against the Officers.

    2.    <u>State Law Claims.</u>

        a.    Summary Judgment is Granted in Favor of Officer McCabe, as He Took No Part in <u>the Alleged Torts.</u>

As an initial matter, the court grants summary judgment in favor of Officer McCabe on the state law claims because he took no part in the pursuit of Willets after Plaintiffs entered Willets's truck, and because he was not at the scene of the shootout until firing had already ceased.  <u>See</u> McCabe Decl. ¶¶ 1-5.

        b.    Officers Towne, Tanaka, Unga, Johnson, and Yano Have a Privilege Against <u>Liability for the State Law Claims.</u>

The other moving Officers argue that, as nonjudicial governmental officials who were acting in the performance of their public duty, they are entitled to a "qualified or conditional privilege."  Motion at 11-13.  They argue that "[t]he practical result of such privilege is the requirement that the unlawful act be motivated by malice and not by an otherwise proper purpose."  Motion at 12.  Arguing that "[t]here is no hint or allegation that [they] were acting on anything other than a sincere desire to protect the public, their fellow officers, and themselves," the Officers contend that they are entitled to summary judgment on all of the state law tort claims against them.  Motion at 12.  The court agrees.

Hawaii law provides that a nonjudicial government official has a qualified or conditional privilege with respect to his or her tortious actions taken in the performance of his or her public duty.  Towse v. State of Hawaii, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982); Runnels v. Okamoto, 56 Haw. 1, 4, 525 P.2d 1125, 1128 (1974).  This privilege shields all but the most guilty nonjudicial officials from liability, but not from the imposition of a suit itself.  Towse, 64 Haw. at 631, 647 P.2d at 702.  The privilege is the result of the Hawaii Supreme Court's balancing of competing interests.  It protects the innocent public servant's pocketbook, yet it allows an injured party to be heard.  See Medeiros v. Kondo, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974).

For a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose. Towse, 64 Haw. at 631-33, 647 P.2d at 702-03; Medeiros, 55 Haw. at 504-05, 522 P.2d at 1272.  When a public official is motivated by malice, and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant.  Marshall v. Univ. of Haw., 9 Haw. App. 21, 37, 821 P.2d 937, 946 (Ct. App.

1991), <u>abrogated on other grounds by Hac v. Univ. of Haw.</u>,
102 Haw. 92, 73 P.3d 46 (2003).

The existence or absence of malice is generally a
question for the jury.  <u>Runnels</u>, 56 Haw. at 5, 525 P.2d at 1129.
However, when the existence or absence of malice is demonstrated
to the court via uncontroverted affidavits or depositions, the
court may rule on the existence or absence of malice as a matter
of law.  <u>See</u> <u>id.</u>

In examining whether malice exists, Plaintiffs maintain
that Hawaii courts apply the "reasonable man" test set forth in
<u>Towse</u>, 64 Haw. at 633, 647 P.2d at 703, a defamation case.[7]  At
the hearing, however, Plaintiffs conceded that they had no
authority requiring application of the "reasonable man" test to
this case, which does not involve a defamation claim.  This court
does not read <u>Towse</u> as requiring application of the "reasonable

---

[7] In <u>Towse</u>, the Hawaii Supreme Court defined malice in
<u>a defamation case</u>, stating that, "<u>in this case</u> the 'reasonable
man' test" should be applied.  <u>Id.</u> at 632, 647 P.2d at 703
(emphasis added).  <u>Towse</u> therefore stated that, in the context of
a defamation claim, a "defendant is required to act as a
reasonable man under the circumstances, with due regard to the
strength of his belief, the grounds that he has to support it,
and the importance of conveying the information."  <u>Id.</u> at 633,
647 P.2d at 703.  <u>Towse</u>'s reasonableness requirement is
consistent with Hawaii's cause of action for defamation.  A
qualified privilege exists "when the author of the defamatory
statement reasonably acts in the discharge of some public or
private duty, legal, moral, or social, and where the publication
concerns subject matter in which the author has an interest and
the recipients of the publication a corresponding interest or
duty."  <u>Vlasaty v. Pac. Club</u>, 4 Haw. App. 556, 562, 670 P.2d 827,
832 (Ct. App. 1983) (citation omitted).

man" test to the facts of this nondefamation case.  To hold
otherwise would effectively remove the "malice" requirement and
run contrary to the Hawaii Supreme Court's admonition that only
the most guilty of officials are liable for their tortious acts.
See Towse, 64 Haw. at 631, 647 P.2d at 702.

In the present case, there is no dispute that the
Officers are nonjudicial government officials who are eligible
for the qualified or conditional privilege discussed in Towse.
Accordingly, to hold the Officers liable for the state law tort
claims, Plaintiffs must "prove, to the requisite degree, that the
[Officers] had been motivated by malice and not by an otherwise
proper purpose."  Id. at 631, 647 P.2d at 702.

The Officers' uncontroverted declarations establish
that they returned gun fire only after Willets had fired at them.
See Towne Decl. ¶¶ 9, 10, 15-18, 21, 22; Johnson Decl. ¶¶ 8-10,
15, 16, 18, 19; Unga Decl. ¶¶ 12, 15, 16, 18, 19, 22, 23; Yano
Decl. ¶¶ 10, 11, 15, 16, 18, 19, 23-25; Tanaka Decl. ¶¶ 13,
16-18, 19.  Plaintiffs point to nothing in the record that raises
a genuine issue of fact as to whether the Officers were motived
by malice, rather than by a desire to protect the public, other
officers, and themselves.  Accordingly, even though the existence
of malice is generally a question for the jury, because the
Officers' assertions that they discharged their weapons only

after Willets fired at them are uncontroverted, there is no evidence of malice and summary judgment is warranted.[8]

Plaintiffs argue that, under Haw. Rev. Stat. § 703-307, the use of deadly force by a police officer is justified only when "the force employed creates no substantial risk of injury to innocent persons." Plaintiffs say that, because two-year-old Kyle was in Willets's truck, the Officers' use of deadly force was unjustified. Plaintiffs equate unjustified force with an improper purpose. In so arguing, Plaintiffs conflate the objective test for whether the Officers' use of deadly force was justified under Haw. Rev. Stat. § 703-307 with the subjective motivation of the Officers under Hawaii law, which examines whether the Officers were "motivated by malice and not by an otherwise proper purpose." Medeiros, 55 Haw. at 504-05, 522 P.2d at 1272. Although proving subjective motivation by clear and convincing evidence may be a difficult standard for Plaintiffs to meet, that is the burden that the Hawaii Supreme Court has adopted in its effort to balance competing interests. Accordingly, whether the Officers were objectively justified in their use of deadly force is irrelevant to the determination of

---

[8] The court disagrees with Plaintiffs' contention that malice may be inferred by the number of times the Officers shot at Willets's vehicle. The number of shots fired is not clear and convincing evidence of malice. Thus, an officer whose aim is bad and who therefore fires many times at a target is not clearly malicious in contrast to an officer who fires a single shot with deadly accuracy.

whether those Officers were subjectively motivated by a proper or improper purpose.

Even assuming that Chris and Kyle were "innocent persons" and that the deadly force used was unjustified, Plaintiffs fail to point to any evidence that raises a genuine issue of fact as to whether the Officers were <u>motivated</u> by malice or an improper purpose.  Because Plaintiffs do not show how they would meet their burden at trial of demonstrating by clear and convincing evidence that the Officers were "motivated by malice and not by an otherwise proper purpose," the Officers are entitled to summary judgment on the state law tort claims.[9]

B.   The City's Motion.

The City has moved for summary judgment on Plaintiffs' § 1983 claims against it, arguing that, because there was no constitutional violation, the § 1983 claims fail.  This court has already found above that an issue of fact exists as to whether there was a constitutional violation.  The City is therefore unpersuasive on this point.

The City next argues that Plaintiffs fail to assert viable § 1983 claims based on the City's alleged ratification of the Officers' actions or on inadequate training of the Officers. A question of fact as to whether the City ratified an improper

_____

[9] As Officer Tong did not move for summary judgment on the state law claims, they remain for adjudication against him.

32

shooting precludes summary judgment on that issue.  Similarly, there is a question of fact as to whether the training the Officers received with respect to recognizing hostage situations amounted to "deliberate indifference."  The City's motion is therefore denied with respect to Plaintiffs' inadequate training theory.

The City also argues that it is entitled to summary judgment on Plaintiffs' state law claims because the individual Officers are not liable for those claims.  The court agrees in part.  To the extent the Officers are not liable with respect to the state law claims, as set forth above, the City is not vicariously liable to Plaintiffs with respect to those claims.  Summary judgment on those claims is granted to the City.  This, of course, leaves the state law claims against the City based on Officer Tong's actions.

This also leaves Plaintiffs' separate negligent supervision claim asserted against the City.  As explained later in this order, the City has failed to meet its initial burden on this motion of demonstrating that it is entitled to summary judgment on the negligent supervision claim.

1.   Plaintiffs' § 1983 Claims.

Because this court has already found that there is an issue of fact as to whether a constitutional violation occurred, the City is not entitled to summary judgment on Plaintiffs'

33

§ 1983 claim based on its argument that there was no constitutional violation.  This, of course, does not end this court's analysis, as Plaintiffs must still demonstrate the other elements of viable § 1983 claims.

Local governmental bodies such as the City are "persons" that may be sued under § 1983.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978).  However, under § 1983, the City is only liable for its own actions.  The City is not liable under § 1983 based on respondeat superior liability, as it is with respect to negligence claims.  Id. at 694.

Municipal liability under § 1983 may be established in one of three ways.

> First, the plaintiff may prove that a city
> employee committed the alleged constitutional
> violation pursuant to a formal governmental
> policy or a longstanding practice or custom
> which constitutes the standard operating
> procedure of the local governmental entity.
> Second, the plaintiff may establish that the
> individual who committed the constitutional
> tort was an official with final policy-making
> authority and that the challenged action
> itself thus constituted an act of official
> governmental policy.  Whether a particular
> official has final policy-making authority is
> a question of state law.  Third, the
> plaintiff may prove that an official with
> final policy-making authority ratified a
> subordinate's unconstitutional decision or
> action and the basis for it.

Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1993) (citations and internal quotations omitted).  In their opposition, Plaintiffs argue that the City's liability arises

under the ratification theory of liability.  Plaintiffs
secondarily argue that the City is also liable under § 1983 based
on a policy or custom of inadequate training.

Plaintiffs allege that, after the Officers fired 155
rounds at Willets's truck, the review board investigated the
incident and found that "the officers' discharge of their
firearms was justified."  The review board recommended "that no
further action be taken against them."  See Ex. 1 at 1471.  Major
Dave Kajihiro then notified the Officers that Chief Donohue
concurred with the review board's findings, that the
investigation was closed, and that no further action would be
taken against them.  See Ex. 1 at 1462-63, 1467-70.  In the
course of this litigation, the City has taken the position that
the Officers fired their weapons within the course and scope of
their employment, consistently with their training in all
respects, and reasonably.  See Ex. 5 ¶¶ 1-3.

The City has indicated that, although no specific
training was provided to the Officers regarding hostage
situations, "the officers were provided with and advised of the
Honolulu Police Department's Departmental Plans and Procedures
regarding barricade, hostage, and sniper incidents."  See Ex. 6
¶ 2.  That policy requires officers to initially respond and
contain hostage incidents until the Specialized Services Division
("SSD") assumes control.  See Ex. 1 at 26.

35

a.   <u>Ratification.</u>

Plaintiffs' primary argument on the § 1983 claim is that the City ratified the Officers' actions when it determined that the Officers were "justified" in their use of force and when it took no adverse action against them.  Whether a municipality's investigation evidences a policy or a custom giving rise to § 1983 liability has been discussed in a line of Ninth Circuit cases.

In <u>McRorie v. Shimoda</u>, 795 F.2d 780 (9th Cir. 1985), for example, the Ninth Circuit recognized that, for purposes of municipal liability under § 1983, a "[p]olicy or custom may be inferred if . . . officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error."  <u>Id.</u> at 784 (citing <u>Grandstaff v. City of Borger</u>, 767 F.2d 161, 171-72 (5th Cir. 1985)).  <u>McRorie</u> arose in the context of a motion to dismiss granted by a district court without explanation.  <u>Id.</u> at 782.  The Ninth Circuit reversed and remanded with the direction that the plaintiff "be given the opportunity to amend his complaint to make allegations about the officials' conduct."  <u>Id.</u> at 784.  <u>McRorie</u> teaches that a municipality may be liable under § 1983 for failing to reprimand an employee.  <u>McRorie</u> does not, however, go so far as to hold that a municipality must be following a policy or a

36

custom giving rise to § 1983 liability whenever its investigation
fails to lead to a reprimand or discharge of an employee.

Because McRorie relied on Grandstaff, this court
examines that Fifth Circuit case.  In Grandstaff, officers had
been chasing a suspect driving a pickup truck, exchanging gunfire
with that suspect.  767 F.2d at 165.  The suspect drove his
pickup truck onto a ranch and hid.  The owner of the ranch,
noticing activity on his property, got into his pickup truck and
drove to where the activity was occurring.  The officers mistook
the owner for the suspect and opened fire on him, killing him.
Id.  On appeal from a successful § 1983 trial against the city,
the Fifth Circuit affirmed, holding that, for purposes of
municipal liability under § 1983, a policy could be inferred from
the city's failure to reprimand or discharge any officer in
connection with the ranch owner's death and from the lack of an
admission of error.  Id. at 171.  The Fifth Circuit reasoned
that, "If that episode of such dangerous recklessness obtained so
little attention and action by the City policymaker, the jury was
entitled to conclude that it was accepted as the way things are
done and have been done in the City of Borger."

The Ninth Circuit appears to require something more
than a failure to reprimand to establish ratification.  In Larez
v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991), the Ninth
Circuit relied on expert testimony that the Los Angeles Police

Force ("LAPD") routinely exonerated officers, suggesting that
LAPD investigations of officers were shams.  Jessie Larez
("Larez") had lodged a complaint with the police department,
claiming that he had suffered a broken nose and that he needed
surgery on his knees and neck because of the way police had
forced him to the floor.  Id. at 634-45.  Larez was notified by
the police chief that none of the allegations in his complaint
could be sustained.  Id. at 635.

          After Larez prevailed in a bifurcated trial against the
individual officers, Larez tried his claims against the police
chief and the city.  Id.  Larez's expert testified that, pursuant
to the LAPD citizen complaint procedure, it was "almost
impossible for a police officer to suffer discipline as a result
of a complaint lodged by a citizen."  Id.  Under that policy, the
very unit being investigated "was given the responsibility of
passing upon the complaint's many allegations."  Id. at 647.  The
expert also concluded that the investigation in issue contained
holes and inconsistencies that should have been visible to any
reasonable administrator.  For example, the investigation relied
on testimony by an officer who had not been present "during some
of the relevant incidents."  Id.  Under these circumstances, the
Ninth Circuit concluded that a "jury properly could find [a]
policy or custom from the failure of [the police chief] to take

any remedial steps after the violations."[10]  Id. (citing
Grandstaff, 767 F.2d at 171).

Haugen v. Brosseau, 339 F.3d 857 (9th Cir. 2003), rev'd
on other grounds by Brosseau v. Haugen, 543 U.S. 194 (2004) (per
curiam), is perhaps the clearest indication of the limits the
Ninth Circuit places on inferring a policy or a custom for § 1983
purposes from a failure to discipline an officer.  In Haugen,
Officer Rochelle Brosseau ("Officer Brosseau") shot Kenneth J.
Haugen ("Haugen") in the back as Haugen tried to escape in a
Jeep.  339 F.3d at 861.  Haugen contended that the city and the
police department should be held liable because they had failed
to discipline Officer Brosseau after the shooting.  The Ninth
Circuit noted that a single decision by a policymaker may be
sufficient to approve a subordinate's decision, ratifying that
decision for purposes of § 1983 liability.  However, the Ninth
Circuit said that the plaintiff must show the decision was the
product of a conscious, affirmative choice to ratify the conduct
in question.  Id. at 875.  Such a ratification "could be
tantamount to the announcement or confirmation of a policy for
purposes of Monell."  Id.  Because there were no facts in the
record suggesting that the single failure to discipline Officer

---

[10] Although concluding that a jury could find a policy
or custom based on the city's failure to take remedial steps, the
Ninth Circuit reversed on other grounds.  See Larez, 946 F.2d at
649.

Brosseau rose to the level of a ratification, the Ninth Circuit concluded that the city and the police department were entitled to summary judgment.[11]  Id. at 875; accord Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989) ("we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability").

McRorie, Grandstaff, Larez, and Haugen establish that municipal liability under § 1983 may arise from a city's failure to reprimand an employee.  However, liability does not necessarily arise based only on a failure to reprimand. Something more than the failure to reprimand is needed to survive a motion for summary judgment.  In Haugen, that something more was lacking; thus, summary judgment was appropriate.  In Larez and Grandstaff, on the other hand, there was something more.  In Larez, evidence was introduced that there were "holes" and "inconsistencies" in the review board's findings that should have been apparent to any reasonable administrator.  Moreover, the plaintiff's expert testified that it was nearly impossible for an officer to be disciplined as a result of a citizen complaint and that a unit was allowed to investigate itself.  In Grandstaff,

---

[11] Haugen demonstrates that, although the issue of whether ratification occurred is ordinarily a question for a jury, see Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999), to survive a motion for summary judgment, a plaintiff must still establish that there is a genuine issue of material fact regarding whether a ratification occurred.

the officers' conduct was so outrageous that a reasonable
administrator should have known that he or she should do
something about it.

> As this court has previously explained:

> > The law does not say that every failure to
> > discipline an officer who has shot someone is
> > evidence of a "whitewash" policy or some
> > other policy of "sham" investigations.  The
> > law does not say that, whenever an
> > investigative group accepts an officer's
> > version over a victim's differing version,
> > this acceptance establishes a policy for
> > which a municipality may be held liable under
> > § 1983.  If that were the law, counties might
> > as well never conduct internal investigations
> > and might as well always admit liability.
> > But that is not the law.  The law clearly
> > requires "something more."

Kanae v. Hodson, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003).

In the present case, the review board concluded that
the Officers were "justified" in their use of deadly force.  This
fact, by itself, is insufficient to demonstrate ratification.
See Haugen, 339 F.3d at 875; see also Kanae, 294 F. Supp. 2d at
1191 ("As Kanae presents nothing more than the failure to
discipline Hodson, the County is entitled to summary judgment on
Kanae's § 1983 ratification claim.").  Nor does the Officers'
firing of 155 rounds at Willets's truck suffice by itself as the
"something more" necessary to find ratification.  After all,
Willets fired at the police, so the Officers' conduct certainly
did not rise to the level of outrageousness in Grandstaff.
However, the multiple shots, when combined with the knowledge of

at least most of the Officers that two-year-old Kyle was in the car they were shooting at, raise a question about whether a reasonable administrator should have found the shooting justified.  Section 703-307 of the Hawaii Revised Statutes justifies an officer's use of deadly force only when it "creates no substantial risk of injury to innocent persons."  Because the record before this court does not indicate whether the review board or Chief Donohue examined whether the Officers' use of deadly force created a substantial risk of injury to the two-year-old child,[12] the court finds a question of fact as to whether the review board's findings constituted ratification of § 1983 purposes.  The City's motion is denied with respect to Plaintiffs' § 1983 claim based on a ratification theory.

b.   <u>Inadequate Training.</u>

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983."  <u>City of Canton v. Harris</u>, 489 U.S. 378, 387 (1989).  "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  <u>Id.</u> at 388.  In other words, only

---

[12] Under Local Rule 56.1(f), the court has no independent duty to examine the voluminous record in this case to determine what factors the review board considered in making its findings.

42

when a city's "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. Moreover, for liability to attach to a municipality's failure to train, the lack of training "must be closely related to the ultimate injury." Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001). "In other words, a plaintiff must show that his or her constitutional 'injury would have been avoided' had the governmental entity properly trained its employees." Id.

Deliberate indifference" occurs when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390; accord Gregory v. County of Maui, 414 F. Supp. 2d 965, 969 (D. Haw. 2006). Whether a City has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question. Gibson v. County of Washoe, 290 F.3d 1175, 1194-95 (9th Cir. 2002).

At the hearing, the court asked Plaintiffs to articulate precisely their theory of inadequate training. Plaintiffs responded that, because the Officers were inadequately trained to recognize hostage situations, the Officers did not

43

treat the pursuit as a hostage situation.  In other words, Plaintiffs contend that, even though the City has a policy of having officers contain hostage situations until SSD assumes control, that policy was not followed because the Officers were inadequately trained by the City to recognize the pursuit as a hostage situation in the first place.  Given the current bare record before this court, there is an issue of fact as to whether "the need for more or different training [wa]s so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  City of Canton, 489 U.S. at 390.  Accordingly, to the extent Plaintiffs' § 1983 claim against the City is based on a failure to train, the City's motion is denied.

2.   State Law Claims.

The City's alleged liability for the torts alleged in Counts I-IV (assault, battery, and emotional distress claims) is based solely on respondeat superior liability.  See Opp. at 9. To the extent that this court has already found the Officers not liable for those claims, the City is likewise not liable for them.  See Davis v. Wholesale Motors, Inc., 86 Haw. 405, 426, 949 P.2d 1026, 1047 (Ct. App. 1998) ("An adjudication acquitting an employee of liability bars a finding of liability on the part of the employer when the employer's liability rests solely on

respondeat superior." (quotation and citation omitted)).
However, as the state law tort claims remain against Officer
Tong, respondeat superior claims remain against the City with
respect to Officer Tong's actions.  Accordingly, with respect to
the state law claims, the City's motion is granted in part and
denied in part.

The City next baldly claims that the conditional
privilege discussed in <u>Towse</u> applies to Plaintiffs' negligence
claim against it (Count V).  In their opposition, Plaintiffs
clarify that Count V asserts a claim for negligent supervision.
Given the complete lack of briefing with respect to this claim,
the City has not met its initial burden on this motion of
demonstrating that it is entitled to summary judgment on this
claim.  Count V therefore remains for further adjudication.  It
may well be that the City will ultimately prevail on Count V.  On
the present bare record, however, the City is not entitled to
summary judgment on its negligent supervision claim.

C.   <u>Plaintiffs' Rule 56(f) Request.</u>

Plaintiffs request a continuance pursuant to Rule 56(f)
of the Federal Rules of Civil Procedure "should the Court have
additional questions or concerns."  Rule 56(f) permits a district
court to continue a summary judgment motion "upon a good faith
showing by affidavit that the continuance is needed to preclude
summary judgment."  <u>California v. Campbell</u>, 138 F.3d 772, 779

(9th Cir. 1998).  A party requesting a continuance bears the
burden of (1) filing a timely application which specifically
identifies relevant information; (2) demonstrating that there is
some basis to believe that the information sought exists; and (3)
establishing that such information is essential to resist the
summary judgment motion.  See Employers Teamsters Local Nos. 175
& 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1130 (9th
Cir. 2004) (citation omitted); Campbell, 138 F.3d at 779.  As
Plaintiffs do not show any belief that relevant information
exists or that discovery is essential to resist the summary
judgment motion, the Rule 56(f) request is denied.

V.      CONCLUSION.

        Regarding claims against the moving Officers, the court
denies summary judgment as to Plaintiffs' § 1983 claim.  However,
the court grants summary judgment in favor of the Officers on the
state law tort claims asserted against them.

        Regarding claims against the City, the court denies
summary judgment as to Plaintiffs' § 1983 and negligent
supervision claims.  The court grants summary judgment in favor
of the City on the state law tort claims based on the City's
vicarious liability for the moving Officers' conduct.  However,
because Officer Tong has not moved for summary judgment, the
City's vicarious liability for the state law claims asserted
against him remain before the court.

46

The court denies Plaintiffs' request for a Rule 56(f) continuance.

This order leaves the following claims for further adjudication:  (1) Plaintiffs' § 1983 claims against all Defendants, including Officer Tong; (2) Plaintiffs' state law claims against Officer Tong; (3) Plaintiffs' state law claims against the City based on Officer Tong's actions; and (4) Plaintiffs' negligent supervision claim against the City.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 14, 2006.


_Susan Oki Mollway_
Susan Oki Mollway
United States District Judge


**Edenfield, et al. v. Estate of Willets, et al.**, Civ. No. 05-00418 SOM/BMK;
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT.